## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARK STACKHOUSE, Executor of the Estate of WALTER STACKHOUSE, Deceased,** | : | Civil Action No. 1:21-cv-613 |
| | : | |
| | | **COMPLAINT AND JURY DEMAND** |
| Plaintiff, | : | (Tag-Along Action) |
| | | |
| v. | : | |
| | | |
| **MONSANTO COMPANY, INC.** | : | |
| | | |
| Defendant. | : | |

Plaintiff, Mark Stackhouse, Executor of the Estate of Walter Stackhouse, Deceased, by and through his undersigned attorney, hereby brings this Complaint for damages against Defendant Monsanto Company, Inc. and alleges the following:

### INTRODUCTION

1.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup® contains the surfactant polyoxyethylene tallow amine ("POEA") and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most used pesticide active ingredient in

American agriculture with 85-90 millions pounds used annually.  That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

2.　　Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the U.S. were Roundup Ready®.[3]

3.　　Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup® is used.[5]  Glyphosate has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who were not in direct contract with glyphosate.[8]

---

[1] Grube, Arthur, et al., U.S. EPA, *Pesticides Industry Sales and Usage, 2006 and 2007 Market Estimates* 12 (2011) available at https://www.epa.gov/sites/production/files/2015-10/.../market_estimates2007.pdf.
[2] ETC Group, *Who will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] Neuman, William & Andrew Pollock, Farmers Cope with Roundup-Resistant Weeds, N.Y. Times, May 3, 2010.
[4] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.
[5] See U.S. Geological Survey, *USGS Technical Announcement: Widely used Herbicide Commonly found in Rain and Streams in the Mississippi River Basin* (2011), available at http://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article/asp=ID=2909.html; see also National Pesticide Information Center, *Glyphosate Fact Sheet*, available at http://npc.orst.edu/factsheets/glyphogen.pdf.
[6] Bohn, Thomas, et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201.
[7] Acquavella, John F. et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/.
[8] Brändli, Dirk & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

4.      In March of 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), evaluated several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued a formal monograph relating to glyphosate.  In that monograph, the IARC working group provides a thorough review of the studies and data relating to glyphosate exposure in humans.

6.      The IARC working group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans.  The IARC working group concluded that the cancers most associated with glyphosate exposure were non-Hodgkin's lymphoma ("NHL") and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7.      The IARC evaluation is significant because it confirmed what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, has represented glyphosate as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.      Federal diversity in this Court is proper pursuant to 28 U.S.C. 1332 because Plaintiff is a citizen of Ohio, a different state that that of Defendant's place of incorporation

---

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

(Delaware) and Defendant's headquarters (Missouri), and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto because Monsanto transacts business in Ohio and is a corporation doing business within Ohio.  Monsanto knows or should have known that its Roundup® products are and were sold throughout the state of Ohio, and, more specifically, caused Roundup® to be sold to Plaintiff in Ohio.

11.     In addition, Monsanto maintains sufficient contacts with the state of Ohio such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper within this District because the events giving rise to this action happened in or are closely related to this District.

13.     Currently an action is pending before Judge Vince Chhabria, *In Re Roundup Products Liability Litigation*, MDL No. 2741, N.D. Cal. Case No. 16-md-02741-VC.  MDL No. 2741 contains similar factual issues rendering Plaintiff's claims appropriate for Tag-Along treatment under Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation and 28 U.S.C. Section 1407.

## PARTIES

14.     Plaintiff Mark Stackhouse is the Executor of the Estate of Walter Stackhouse.  As such, the Plaintiff is a natural person, citizen of the state of Ohio, and resident of Orwell, Astabula County, Ohio.

15.     Walter Stackhouse was exposed to Roundup® in or around Astabula County, Ohio from approximately the mid-1970s to 2012.  Mr. Stackhouse purchased Roundup® in bulk by the tote or by cases of jugs and sprayed with an open cab tractor 2-3 times per season.  He

4

also sprayed Roundup® along the fence lines and around the farm with a portable sprayer. In his job with the telephone company, Mr. Stackhouse regularly sprayed pedestals, pole lines, fencing and buildings with Roundup® by means of a pump sprayer. He was diagnosed with Waldenstrom macroglobulinemia, a form of NHL, in approximately 2009. Walter Stackhouse ultimately died from Central Nervous System Lymphoma, also a form of NHL, on December 3, 2012 at age 74.

16. Defendant Monsanto Company is a corporation created under the laws of the state of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

## FACTS

17. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where is interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling procedure or by milling, baking or brewing grains.

19. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. This occurred because Monsanto introduced Roundup® and touted glyphosate as a technological breakthrough. Glyphosate was said to have the propensity to kill almost every week without causing harm either to people or to the

environment.  Of course, history has shown those claims not to be true.  According to WHO, the main ingredient of Roundup® - glyphosate – is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers.  Monsanto assured the public that Roundup® was harmless.  To prove this assertion, Monsanto supported data that was false and attacked studies that revealed any dangers of Roundup®.

### The Discovery of Glyphosate and Development of Roundup®

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced into the market in the 1970s under the brand name Roundup®.[10]  Monsanto marketed Roundup® as a safe general purpose herbicide for widespread commercial and consumer use throughout the 1970s and to the present day.[11]

21.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as trade secrets in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not inert and are toxic.

### Registration of Herbicides under Federal Law

22.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. 136, et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), *supra.*

[11] *See* Monsanto, *Crop Protection*, https://monsanto.com/products/safety-information/crop-protection-safety/ (last visited 01/03/2019) ("the data support a conclusion that glyphosate exhibits low toxicity, is not a carcinogen, does not accumulate in the food chain, and all approved uses are **safe** for humans and the environment"). (Emphasis added.)

Agency ("EPA") prior to distribution, sale, or use, except as described by FIFRA.  7 U.S.C. 136a(a).

23.     Because pesticides are to some degree, toxic to plants, animals, and humans, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA must make in registering or re-registering a product is not that the product is safe, but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. 135a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide."  7 U.C.S. 136 (bb).  FIFRA therefore requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

25.     The EPA and the state of Ohio registered Roundup® for distribution, sale, and manufacture in the United States and the state of Ohio.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that much be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not require, nor is it able, however, to perform the product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a congressionally mandated process called "re-registration."  7 U.S.C. 136a-1. To re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

28.     In the case of glyphosate and therefore Roundup®, the EPA had planned to release its preliminary risk assessment in relation to the re-registration process by July 2015. The EPA completed review of glyphosate in early 2015, but delayed its relating of the risk assessment pending further review given the WHO's health-related findings.

**Scientific Fraud underlying the Marketing and Sale of Glyphosate and Roundup®**

29.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPS originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  As a result of pressure from Monsanto, including contrary studies Monsanto provided to the EPS, the EPA changed that classification to evidence of non-carcinogenicity in humans (Group E) in 2011.  With this classification, however, the EPA clarified that the classification did not mean that this pesticide does not have the propensity to cause cancer: "It should be emphasize, however, that the designation of an agent in Group E is based on the available evidence at the time of the evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

30.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

---

[12] U.S. Environmental Protection Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/.../103601.htm.

31.    In the first instance of fraud, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup® when Monsanto sought its initial registration of Roundup® by the EPA.[13]  This lab performed thirty tests on glyphosate and on products containing glyphosate, including nine of the fifteen residue studies needed to register Roundup®.

32.    In 1976, the U.S. Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impact of glyphosate.  The EPA subsequently audited IBT and discovered that the toxicology studies conducted for the Roundup® herbicide also to be invalid.[14]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

33.    Three top executives of IBT were convicted of fraud in 1983.

34.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

35.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marking Roundup® in 115 counties.

## The Importance of Roundup® to Monsanto's Market Dominance Profits

---

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[14] U.S. Environmental Protection Agency, *Summary of IBT Review Program Office of Pesticide Programs* (1983) available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=91014ULV.TXT.

[15] Robin, Marie-Monique, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Environmental Protection Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch*.  Washington, D.C. (Aug. 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

36.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agricultural division was outperforming its chemical division's operating income, and the gap increased yearly.  But with its patent for glyphosate expiring in the United States in year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

37.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  As Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crops. This allowed Monsanto to expand its market for Roundup® even further.  By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  Monsanto's dominant market share of the glyphosate/Roundup® market was secured through a marketing strategy that combined Monsanto's proprietary Roundup Ready® seeds with continued sales of Roundup®.

38.     By increasing production, decreasing prices, and coupling Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.  By 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a 5:1 margin, and comprising almost one-half of all of Monsanto's revenue.[17]  More of glyphosate is still sold today than any other herbicide in the world.

**Monsanto has Known for Decades that It Falsely Advertises the Safety of Roundup®**

39.     In 1996, the New York Attorney General ("N.Y.A.G.") filed litigation against Monsanto based on its false and misleading advertising of Roundup® products.  The lawsuit

---

[17] Barboza, David, *The Power of Roundup: A Weed Killer is a Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001.

challenged Monsanto's general representations that its glyphosate-based herbicides what were sprayed onto vegetation, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish.  Among the representations that the N.Y.A.G. alleged were deceptive and misleading as to the human and environmental safety of glyphosate and/or Roundup® were the following:

    a.  "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confident along customer's driveways, sidewalks, and fences."

    b.  "And remember that Roundup is biodegradable and won't buildup in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem."

    c.  "Roundup biodegrades into naturally occurring elements." "Remember that versatile Roundup herbicide stays were you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

    d.  "This non-residual herbicide will not wash or leach into the soil. It…stays where you apply it."

    e.  "You can apply Roundup with 'confidence because it will stay where you put it.'  It binds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products." Glyphosate is less toxic to rats than table salt following acute oral ingestion."

    f.  "Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers' who manufacture or use it."

    g.  "You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

    h.  "Roundup can be used where kids and pets will play and breaks down into natural material."

    i.  "This ad depicts a person with his head in the ground and a pet dog in an area which has been treated with Roundup®."[18]

    40.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the N.Y.A.G., in which Monsanto agreed, among other items, "to cease and desist from

---

[18] Attorney General of the state of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

    a.  Its pesticides containing glyphosate or any component of such products are safe, non-toxic, harmless or free from risk.

    b.  Its pesticides containing glyphosate or any component of such products manufactured, formulated or distributed by Monsanto are biodegradable.

    c.  Its pesticides containing glyphosate or any component of such products stay were they are applied under all circumstances and will not move through the environment by any means.

    d.  Its pesticides containing glyphosate or any component of such products are "good" for the environment or are "known for their environmental characteristics."

    e.  Its pesticides containing glyphosate or any component of such products are safer or less toxic than common consumer products other than herbicides.

    f.  Its pesticides containing glyphosate or any component of such products might be classified as "practically non-toxic."

41. Upon information and belief, Monsanto did not alter its advertising in the same manner in any other state, including Ohio.

42. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French high court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

## Classification and Assessments of Glyphosate

43. The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined that 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A

---

[19] *Monsanto Guilty in "False Ad" Row*, BBC, Oct. 15, 2009, available at news.bbc.co.uk/2/hi/europe/8308903.stm.

(Probable  Human  Carcinogens);  287 agents to be Group 2B (Possible Human Carcinogens);

503 agents to be Group 3 (Not Classified); and  1 agent to be Probably Not Carcinogenic.

44.    The  established procedure for  IARC  Monograph evaluations  is  described in the

IARC  Programme's  Preamble.[20]  Evaluations  are  performed  by  panels  of  international

experts,  selected  on  the  basis  of  their  expertise  and  the  absence  of  actual  or  apparent

conflicts of interest.

45.    One  year  before  the  Monograph  meeting,  the  meeting  is  announced  and  there

is  a call both  for  data and  for  experts.  Eight months  before  the  Monograph meeting, the

Working  Group  membership  is  selected  and  the  sections  of  the  Monograph  are  developed

by  the  Working  Group  members.  One  month  prior  to  the  Monograph meeting,  the  call  for

data  is  closed  and  the  various  draft  sections  are  distributed  among  Working  Group

members  for  review  and  comment.  Finally,  at  the  Monograph  meeting,  the  Working  Group

finalizes  review of all literature,  evaluates  the  evidence  in  each  category,  and  completes  the

overall  evaluation. Within two weeks  after  the  Monograph  meeting,  the  summary  of  the

Working  Group  findings  are  published  in  The  Lance  Oncology,  and  within  a  year  after  the

meeting,  the  finalized  Monograph  is  published.

46.    In  assessing  an  agent,  the  IARC  Working  Group  reviews  the  following

information:  (a)  human,  experimental,  and  mechanistic  data;  (b)  all  pertinent

epidemiological  studies  and  cancer  bioassays;  and  (c)  representative  mechanistic  data.

The  studies  must  be  publically  available  and  have  sufficient  detail  for  meaningful  review, and

reviewers  cannot  be  associated  with  the  underlying  study.

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans:  Preamble* (2006), available https://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

47.    In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.    On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at the IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated an almost year-long review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publically available."

49.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

50.    Glyphosate was identified as the second most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

51.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater as well as food.

14

52.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

53.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

54.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

56.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphonic acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.    The IARC Working Group further found that glyphosate and glyphosate formations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

15

58.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]    Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

59.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Earlier Findings as to the Danger of Glyphosate to Humans

60.    The EPA published a technical fact sheet as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication relating to glyphosate. This technical fact sheet predates IARC's March 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Taxies Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation

---

[21] Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[22] DeRoos, AnnaClare J., et al., *Cancer Incidence amount Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

and dermal contact during spraying, mixing, and cleanup.  They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

61.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

62.     In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

63.     In 2002, a study by Julie Marc, entitled, *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKI/Cyclin B Activation*, revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

64.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation, demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell cycle dysregulation is a hallmark

---

[23] Nat'l Pesticide Information Ctr., *Glyphosate: General Fact Sheet, supra.*
[24] Cox, Caroline, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. Pesticide Reform 4 (1995); Peas, W.S., et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities*, Environmental Health Policy Program Report, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, Proc. West. Pharmacol. Soc. 34: 43-46 (1991).
[26] Marc, Julie, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 Chem. Res. Toxicol.326-331 (2002).

of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, " [s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

65.    In 2005, a study by Francisco Peixoto entitled *Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation*, demonstrated that the effects of Roundup® on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

66.    In 2006, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells.[29]  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that the supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify the toxicity of glyphosate alone.  The researchers further suggested that the assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study

---

[27] Marc, Julie, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 Biology of the Cell 245, 245-29 (2004).
[28] Peixoto, Francisco, *Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation*, 61 Chemosphere 1115, 1122 (2005).
[29] Benachour, Nora, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 Chem. Res. Toxicol. 97-105 (2008).

confirmed that the adjuvants present in Roundup® are not in fact inert and that Roundup® is potentially far more toxic that its active ingredient glyphosate alone.

67.    The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Walter Stackhouse from Roundup®.

68.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

**Recent Worldwide Bans on Roundup®/Glyphosate**

69.    Several countries have instituted bans on the sale of Roundup® and other herbicides containing glyphosate. This occurred before and in the wake of the initial IARC publications regarding glyphosate in July of 2015.

70.    The Netherlands issued a ban on the sale of all glyphosate-based herbicides, including Roundup®, in April of 2014. That ban took effect at the close of 2015.

71.    In 2015, the public prosecutor in Brazil requested that the Brazilian Justice Department suspect the use of glyphosate.

72.    France banned the private sale of Roundup® and glyphosate after the publication of the IARC assessment concerning glyphosate.

73.    Bermuda banned both the private and public sale of glyphosates, including Roundup®. The government in Bermuda issued the following statement in doing so: "Following a recent scientific study carried out by a leading cancer agency, the importation of

weed spray Roundup has been suspended."[30]

74.    The Sri Lankan government banned the private and commercial use of glyphosate in 2015 out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[31]

75.    In May of 2015, the Columbian government announced its intention to ban the used of Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, as a result of the WHO's finding that glyphosate is probably carcinogenic.[32]

## **Proposition 65 Listing**

76.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[33]  California's Safe Drinking Water and Toxic Enforcement Act of 1986 (referred to as "Proposition 65"), requires the state to maintain and, at least once yearly, revise and republish a list of chemicals known to the state of California to cause cancer or reproductive toxicity.[34]  The OEHHA determined the glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[35]

77.    The listing process under the Labor Code is essentially automatic.  The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code 6382(b)(1).  That section of the Labor Code identifies "[s]ubstances listed as

---

[30] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015.
[31] *Sri Lankan's New President puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015.
[32] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015.
[33] Cal. EPA, Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, and Glyphosate* (Sept. 4, 2015).
[34] Frequently Asked Questions, State of Cal. Dept. of Justice, Office of the Attorney General., available at http://oag.ca.gov/prop65/faq.
[35] Cal EPA, Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, and Glyphosate*, *supra*.

human or animal carcinogens by [IARC]."  The IARC's classification of glyphosate as a
Group 2A chemical (meaning, probably carcinogenic to humans) therefore triggered the
listing of glyphosate on that list.

78.  A business that deploys a listed chemical in its products must provide "clear
and reasonable warnings" to the public prior to exposure to the chemical.  To be clear and
reasonable, a warning must "(1) clearly communicate that the chemical is known to cause
cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person
before exposure."[36]  The law also prohibits the discharge of listed chemical into drinking
water.

79.  Monsanto disputed the listing decision and in January of 2016, filed a lawsuit
against OEHHA and the agency's acting director, Lauren Zeise, in California state court,
seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[37]

80.  Monsanto alleged that OEHHA's exclusive reliance on the IARC decision
significant that "OEHHA effectively elevated the determination of an ad hoc committee of
an unelected, foreign body, which answers to no United States official (let alone any
California state official), over the conclusions of its own scientific experts."[38]  Monsanto
further alleged that the Labor Code listing mechanism presented various constitutional
violations because it "effectively empowers an unelected, undemocratic, unaccountable,
and foreign body to make laws applicable in California."[39]  Among other arguments,
Monsanto argued that Proposition 65"s requirement to provide a "clear and reasonable

---

[36] Frequently Asked Questions, State of Cal. Dept. of Justice, Office of the Attorney General., available at
http://oag.ca.gov/prop65/faq.
[37] Monsanto Company's Verified Petition for Write of Mandate and Complaint for Preliminary and Permanent
Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health hazard Assessment, et al.*, No. 16-
CECG-00183 (Cal. Super. Ct.).
[38] *Id.* at 2.
[39] *Id.* at 3.

warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[40]

### EFSA Report on Glyphosate

81.     On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported regarding its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[41]  The EU country which undertook the review of this pesticide, referred to as the Rapporteur Member State, was Germany. Specifically, the German Federal Institute for Risk Assessment ("BfR") produced the RAR as part of the renewal process for glyphosate in the EU.

82.     That report was sent to EFSA for peer review by that agency, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA received a second mandate from the European Commission to review IARC's findings as to the potential carcinogenicity of glyphosate and glyphosate-containing products.

83.     Based on review of RAR, which included data from industry submitted unpublished studies, EFSA sent a report to the European Commission stating that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No. 1272/2008."[42]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a cancer risk to humans.

84.     EFSA distinguished between the EU and IARC approached to the study and

---

[40] Id.

[41] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, available at https://www.efsa.europa.eu/en/efsajournal/pub/4302.

[42] EFSA Journal, Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate (Nov. 12, 2015), available at https://doi.org/10.2903/j.efsa.2015.4302.

the classification of the chemicals. According to EFSA, although IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA considered only glyphosate and focuses on the individual chemicals and compounds separately.[43] EFSA found the studies conducted with only glyphosate more important than those studying glyphosate-based formulations.

85.     EFSA made the following statement as to its conclusions as to carcinogenicity of glyphosate:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants." Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.[44]

86.     Notwithstanding its conclusion, EFSA set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable operate exposure level ("AOEL") of 0.1 mg.kg bw per day.[45]

**Leading Scientists Dispute EFSA's Conclusion**

87.     On November 27, 2015, ninety-six independent academic and governmental

---

[43] *Id.*
[44] *Id.*
[45] European Food Safety Auth., Conclusion on the peer review of the pesticide right assessment of the active substance glyphosate, *supra.*

scientists submitted an open letter to the EU Health Commissioner, Vytenis Andriukaitis.[46] The scientists expressed strong concerns and urged the Commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[47]

88.     Signatories to the letter include Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of which were part of the IARC Working Group assigned to glyphosate.

89.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially support in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply research and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[48]

90.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin's lymphoma but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was

---

[46] Ltr. from C. Portier, et al. to Commission Vytenis Andriukaitis, Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015).
[47] Id.
[48] Id.

misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established.  However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."[49]

91.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis.  Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.  For instance, the EFSA report dismisses observed trends in tumor incident "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data."  However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplied and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed."  Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories.  The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increased in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas.  BfR additionally

---

[49] *Id.*

25

reported two positive findings for tumors in rats.  Eliminating the inappropriate use of historical data, the unequivocal conclusion is that there are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[50]

92.    The scientists also criticized the EFSA's lack of transparency and the opacity surrounding the data cited in its report – "citations for almost all references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals."  Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[51]

93.    On March 3, 2016, this letter was published in the Journal of Epidemiology & Community Health.[52]

## Statement of Concern Regarding Glyphosate-Based Herbicides

94.    On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*," assessed the safety of glyphosate-based herbicides ("GBHs").[53]  The researchers' "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[54]  The researchers drew seven factual conclusions about GBHs:

---

[50] *Id.*

[51] *Id.*

[52] Portier, C., et al., *Difference in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, J. Epidemiology & Cmty. Health, March 3, 2016.

[53] Myers, J., et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[54] *Id.*

    a. GBHs are the most heavily applied herbicide in the world and usage continue to rise;

    b. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

    c. The half-life of glyphosate in water and soil is no longer than previously recognized;

    d. Glyphosate and its metabolites are widely present in the global soybean supply;

    e. Human exposures to GBHs are rising;

    f. Glyphosate is now authoritatively classified as a probable human carcinogen; and,

    g. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[55]

95. The researchers noted that GBH use has increased approximately 100-fold since the 1970. Furthermore, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[56]

96. The researchers attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevant of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argued, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has not toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[57]

97. Among various implications, the researchers concluded that "existing

---

[55] *Id.*
[56] *Id.*
[57] *Id.*

toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The authors concluded that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[58]

98.     The researchers also criticized the practice of regulators who rely heavily upon "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[59]

99.     The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and ** this re-examination [should] be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[60]

100.     Further, the researchers proposed that to bridge the gap created by the absence of government funds to support research of the effect of GBHs, the regulators could adopt a

---

[58] *Id.*
[59] *Id.*
[60] *Id.*

system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part [of] routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.[61]

### FDA Announces Testing of Glyphosate Residue in Food

101. On February 17, 2016, the FDA announced that the agency would begin testing certain foods for glyphosate residues. The foods to be tested included soybeans, milk, and eggs.[62]

102. In 2014, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failure to monitor for pesticide residue, including that of glyphosate and for its failure to disclose limitations of its monitoring and testing efforts to the public.[63] The GAO cited numerous undisclosed deficiencies in the FDA process, highlighting its omission of glyphosate testing.

103. Historically, the FDA and U.S. Department of Agriculture ("USDA") routinely excluded glyphosate from their testing for the residues of hundred of other pesticides based on the rationale that such testing was too expensive and not necessary to protect the public's health. In 2016, however, the FDA changed its position and determined that it had "'streamlined methods' for testing the weed killer."[64]

---

[61] *Id.*
[62] Gillam, C., *FDA to State Testing for Glyphosate in Food*, Time, Feb. 17, 2016.
[63] U.S. Government Accountability Office, GAO-15-38, *FDA and USDA should strengthen pesticide residue monitoring programs and further disclose monitoring limitations* (2014).
[64] *Id.*

104.    The decision by the FDA to include glyphosate in its testing is critical because this agency has enforcement authority and is empowered to act if pesticide residues exceed enforcement guidelines.[65]

### European Union Vote on Glyphosate Renewal

105.    The license for glyphosate in the EU was set to expire on June 30, 2016. Without extension of its license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase-out in the EU markets.[66]

106.    In the months leading up to the license expiration date, protracted meetings and voted among national experts from the 28 EU Member States failed to produce agreement on an extension.

107.    France, the Netherlands, and Sweden did not support EFSA's report that glyphosate was harmless.[67]  The Swedish environment minister stated that "[w]e won't take risks with glyphosate and we don't think that the analysis done so far is good enough.  We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[68]

108.    The Netherlands argued that relicensing should not occur until after a separate evaluation of glyphosate's toxicity could be conducted.[69]  Italy joined the other EU states in opposing the license renewal citing health concerns.[70]

109.    On June 6, 2016, the EU Members States voted but failed to reach a qualified

---

[65] *Id.*  Pesticide Q&A, FDA, available at
https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583713.htm.
[66] Blenkinsop, P., et al., *Commission to extend glyphosate license for 18 months*, Reuters, June 28, 2016.
[67] Nelson, A., *EU States rebel against plans to relicense weedkiller glyphosate*, The Guardian, March 4, 2016.
[68] *Id.*
[69] Nelson, A., *Vote on Controversial weedkiller's European license postponed*, The Guardian, March 8, 2016.
[70] *Id.*

majority in favor or against re-authorization of glyphosate.[71]

110.    In June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which was expected by the end of 2017.[72]

111.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine ("POEA") from all glyphosate-based herbicides, including Roundup®.[73]  On December 12, 2017, the EU voted in favor of a five-year license for the use of glyphosate.[74]

112.    These restrictions, which are non-binding on the EU Member States, were expected to apply until the European Chemicals Agency issued an opinion as to the chemical's safety.[75]

### Walter Stackhouse's Exposure to Roundup®

113.    **Walter Stackhouse** used Roundup® for at least 35 years.  From the mid-1970s until 2012, Mr. Stackhouse applied **Roundup®** on the crops 2-3 each season using an open cab tractor.  He also sprayed **Roundup®** along fence lines and around the farm with a portable sprayer.    In his job with the telephone company, Mr. Stackhouse also regularly sprayed pedestals, pole lines, fencing and buildings with Roundup® by means of a pump sprayer.  According to Monsanto, the product was to be sprayed and was in fact sprayed two to three times per year each year with Roundup®.

114.    Mr. Stackhouse purchased Roundup® as a liquid form from distributors in

---

[71] Flausch, M., *Commission prolongs glyphosate license by 18 months*, Euractiv, June 29, 2016.

[72] Nelson, A., *Controversial chemical in Roundup weedkiller escapes immediate ban*, The Guardian, June 29, 2016.

[73] Michalopolous, S., *EU agrees ban on glyphosate co-formulant*, Euractiv, July 11, 2016.

[74] *Glyphosate*, European Commission on Pesticides, ec.europa.eu/food/plant/pesticides/glyphosates_en, August 12, 2019.

[75] Nelson, A., *Controversial chemical in Roundup weedkiller escapes immediate ban*, The Guardian, June 29, 2016.

Ohio.

115.    In approximately 2009, Mr. Stackhouse was diagnosed with Waldenstrom macroglobulinemia, a form of non-Hodgkin lymphoma.

116.    Following his diagnosis, Mr. Stackhouse was treated for cancer with chemotherapy and radiation for two years.

117.    In 2011 or 2012, Mr. Stackhouse was diagnosed with Central Nervous System Lymphoma, also a form of NHL.  Mr. Stackhouse died as a consequence of NHL.

118.    Throughout the time that Mr. Stackhouse was exposed to Roundup®, he did not know that his exposure to Roundup® was injurious to his health or the health of others.

119.    Mark Stackhouse, Executor of the Estate of Walter Stackhouse, first learned that exposure to Roundup® could cause NHL and other serious illnesses sometime after July 29, 2015, when IARC first published its evaluation of glyphosate.

### TOLLING OF THE STATUTE OF LIMITATIONS
### DISCOVERY RULE TOLLING

120.    Plaintiff and the Decedent had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate.  The earliest date he or Walter Stackhouse could have learned of the link would have been after IARC released its formal assessment of glyphosate in July of 2015.

121.    Within the time period of any applicable statutes of limitations, neither Plaintiff nor the Decedent could have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

122.    Plaintiff and the Decedent did not discover, and did not know of facts that would caused a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by

him or the Decedent have disclosed that Roundup® and glyphosate would cause Walter Stackhouse's illnesses.

123.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### **Fraudulent Concealment Tolling**

124.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and acting fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

125.    Rather than disclose critical safety information regarding Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

### **Estoppel**

126.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

127.    Instead, Monsanto knowingly, affirmatively and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

128.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### **COUNT ONE**

### **STRICT LIABILITY: DESIGN DEFECT**
### **O.R.C. 2307.75 et seq.**

129.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

130.   Plaintiff brings this strict liability claim against Defendant for defective design.

131.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Walter Stackhouse, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

132.   At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Walter Stackhouse, and/or to which Walter Stackhouse was exposed, as described above.

133.   At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Walter Stackhouse.

134.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Ohio and throughout the United States, including Walter Stackhouse without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

135.   Defendant's Roundup® products, as researched, tested, developed, designed,

34

licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

136.  Defendant's Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

137.  Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

    a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

    b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner.

    c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

    d.  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the ingredient glyphosate.

    e.  Exposure to Roundup® and the glyphosate containing

> products presents a risk of harmful side effects that outweighs a potential utility stemming from the use of the herbicide.
>
> f. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, the ingredient glyphosate, could result in cancer and other severe illness and injuries.
>
> g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.
>
> h. Defendant could have employed safer alternative designs and formulations.

138.    At all times relevant to this litigation, Walter Stackhouse used and/or was exposed to the use of Defendant's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

139.    Walter Stackhouse could have not reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at time of exposure.

140.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.  Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

141.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

142.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or

reckless conduct by Defendant.

143.    Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

144.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Walter Stackhouse's grave injuries, and if not for Defendant's misconduct and omissions, Mr. Stackhouse would not have sustained his injuries or have died a result of NHL.

145.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Walter Stackhouse developed NHL and suffered grave injuries from cancer and from the treatment of that cancer. These injuries were fatal. Mr. Stackhouse suffered from physical pain and mental anguish, diminished enjoyment of life and economic hardship during his remaining lifetime.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other costs and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT TWO

### STRICT PRODUCTS LIABILITY:
### DEFECT DUE TO INADEQUATE WARNING
### O.R.C. 2307.76 ET SEQ.

146.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

147.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

148.    At all times relevant to this litigation, Defendant engaged in the business of

37

testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Walter Stackhouse, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

149.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Walter Stackhouse, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

150.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonably and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

151.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm

associated with the use of and/or exposure to these products.

152.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Walter Stackhouse.

153.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product and not known to end users and consumers, such as Walter Stackhouse.

154.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendant wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

155.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with the products throughout the United States, including Walter Stackhouse, without substantial change in their condition as designed, manufactured, sold, distributed, labeled,

and marketed by Defendant.

156.    At all times relevant to this litigation, Walter Stackhouse used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

157.    Walter Stackhouse could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at the time of his exposure. Mr. Stackhouse relied upon the skill, superior knowledge, and judgment of Defendant.

158.    Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

159.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

160.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and/or at-home users to utilize the products safely and with adequate protection.    Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup and glyphosate. Defendant continued to aggressively promote the efficacy of its

products, even after it knew or should have known of the unreasonable risks from use or exposure and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

161.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Walter Stackhouse's injuries and wrongful death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

162.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Walter Stackhouse.

163.    Defendant is liable to Plaintiff for injuries and wrongful death caused to Walter Stackhouse by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risk associated with the use of or exposure to Roundup® and glyphosate.

164.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Walter Stackhouse's injuries and wrongful death, and if not for Defendant's misconduct and omissions, Mr. Stackhouse would not have sustained his injuries or have died as a result of NHL.

165.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Walter Stackhouse could have avoided the risk of developing injuries or having died of NHL as alleged herein and Mr. Stackhouse could have obtained alternative herbicides.

166.    As a direct and proximate result of Defendant placing its defective

Roundup® products into the stream of commerce, Walter Stackhouse developed NHL and suffered fatal injuries as well as physical pain and mental anguish, diminished enjoyment of life, and economic hardship during the remainder of his life.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**COUNT THREE**

**NEGLIGENCE**

167.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

168.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

169.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Walter Stackhouse.

170.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

171.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products.

Defendant's duty of care owed to consumer and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, the ingredient glyphosate.

172. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

173. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use or exposure to its Roundup® products could cause Walter Stackhouse's injuries and wrongful death and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Stackhouse.

174. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Walter Stackhouse from Roundup®.

175. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup®.

176. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

177.    As  such,  Defendant breached its  duty of  reasonable care  and  failed  to exercise ordinary care  in  the  design,  research,  development, manufacture,  testing,  marketing,  supply, promotion,  advertisement,  packaging,  sale,  and distribution  of its  Roundup® products,  in that Defendant  manufactured  and  produced  defective herbicides  containing  the  chemical glyphosate, knew or had reason to know of the defects inherent in its products,  knew or had reason  to  know that a  user's  or  consumer's  exposure  to  the  products  created  a significant risk of harm and unreasonably  dangerous  side effects,  and  failed to prevent  or  adequately warn of these risks and harm.

178.    Defendant  failed  to  appropriately  and  adequately  test Roundup®,  Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Walter Stackhouse from Roundup®.

179.    Despite the  ability and means  to  investigate, study, and  test  its  products and  to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and  has  further made  false  and/or misleading statements concerning the safety and/or exposure to Roundup®  and  glyphosate.

180.    Defendant's negligence  included:

a.  Manufacturing,  producing,  promoting,  formulating,  creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing,  producing,  promoting,  formulating,  creating, developing, designing,  selling,  and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose  the  results of  trials,  tests and studies  of exposure  to glyphosate,  and,  consequently,   the  risk  of  serious  harm associated with human use of and exposure to Roundup®;

c.  Failing  to  undertake  sufficient  studies  and  conduct necessary  tests  to determine  whether  or  not  Roundup® products  and  glyphosate-containing products  were  safe  for their  intended  use  in  agriculture,  horticulture,  and  at- home

44

use;

d. Failing to undertake sufficient studies and conduct necessary  tests to determine the safety of "inert" ingredients and/or adjuvants contained  within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e. Failing to use reasonable  and prudent  care  in the design, research, manufacture, formulation, and development of Roundup®  products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as a herbicide;

f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective  as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee  would  use  and/or be exposed  to its Roundup® products;

h. Failing to disclose to Walter Stackhouse, users, consumers, and the general  public that the  use  of  and  exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Walter Stackhouse, users, consumers, and the general  public that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Mr. Stackhouse and other users or consumers;

j. Systemically suppressing or downplaying contrary evidence about the risks, incidence,  and prevalence of the side effects of Roundup® and glyphosate-containing products;

k. Representing that its Roundup® products were safe for their intended use when in  fact,  Defendant knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional  materials that would alert the consumers and the general public of the risk of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers  known by Defendant to be associated with or caused by the use of and exposure  to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not

unsafe for use in the agricultural, horticultural industries, and/or home use; and,

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

181. Further, Monsanto under-reported, underestimated, and downplayed the serious dangers of its Roundup® products. Specifically, Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt and other available forms of herbicides.

182. Defendant knew or should have know that it was foreseeable that consumers and/or users, such as Walter Stackhouse, would suffer injuries and wrongful death as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale from Roundup®.

183. Walter Stackhouse did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

184. Defendant's negligence was the proximate cause of the injuries, including the wrongful death, harm, and economic losses that Walter Stackhouse suffered, as described herein.

185. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Walter Stackhouse, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Stackhouse. Defendant's reckless conduct therefore warrants an award of punitive damages.

186. As a proximate result of Defendant's wrongful acts and omission in placing its

defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Walter Stackhouse developed NHL and suffered fatal injuries as well as physical pain and mental anguish, diminished enjoyment of life, and economic hardship during the remainder of his lifetime.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT FOUR

## BREACH OF EXPRESS WARRANTY

187. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

188. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Walter Stackhouse, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant, and its Roundup® products were expected to, and did, reach Walter Stackhouse without any substantial change in their condition.

189. At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended to consumers and the general public, that its Roundup® products were safe to human health and

the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

190. These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries or death complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Walter Stackhouse, and/or that they were safe and effective as agricultural herbicides.

191. The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

192. Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

193. Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable

or safe for their intended, ordinary, and foreseeable use and purpose. Specifically Defendant breached the warranties in the following ways:

    a. Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and,

    b. Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

194. Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Walter Stackhouse could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

195. Walter Stackhouse had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®, and he relied to his detriment on these statements and representations.

196. Walter Stackhouse used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

197. Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Walter

Stackhouse's injuries and wrongful death, rather than expressly excluding such information and warranting that the products were safe for their intended use, Mr. Stackhouse could have avoided the injuries and wrongful death complained of herein.

198.    As a direct and proximate result of Defendant's wrongful acts and omissions, Walter Stackhouse suffered severe and ultimately fatal injuries. Mr. Stackhouse developed NHL and suffered fatal injuries as well as physical pain and mental anguish, diminished enjoyment of life, and economic hardship during his lifetime.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

199.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

200.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Walter Stackhouse, thereby placing Roundup® products into the stream of commerce.

201.    These actions were under the ultimate control and supervision of Defendant.

202.    Before the time that Walter Stackhouse was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and

users, including  Mr. Stackhouse, that its Roundup® products were of merchantable quality and safe and fit for the use for which  they were  intended, specifically, as horticultural herbicides.

203.   Defendant, however, failed to  disclose that  Roundup has dangerous propensities when used as intended and that the use of and/or exposure  t o  Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Walter Stackhouse's injuries and wrongful death.

204.   Walter Stackhouse reasonably relied u p o n  the skill, superior  k n o w l e d g e , and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and  for their intended purpose or use.

205.   The Roundup® products were expected to  reach and  did in fact  reach consumers and  users, including Walter Stackhouse, without  substantial  change in  the condition i n  which they were manufactured and sold by Defendant.

206.   At all times relevant to this  litigation, Defendant was  aware that  consumers and users of its products, including Walter Stackhouse, would use Roundup®  products  as marketed  by Defendant, which is to say that Mr. Stackhouse was the foreseeable user of Roundup®.

207.   Defendant intended that its  Roundup® products be used in  the manner in which Walter Stackhouse in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

208.   In reliance upon Defendant's  implied  warranty, Walter Stackhouse used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended

promoted, and marketed by Defendant.

209.   Walter Stackhouse could not have reasonably discovered or known of the risk of serious injury associated with Roundup® or glyphosate.

210.   Defendant breached its implied warranty to Walter Stackhouse in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries and death, including those injuries and wrongful death complained of herein.

211.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rending the products more dangerous than an ordinary customer or user would expect and more dangerous than alternative products.

212.   As a direct and proximate result of Defendant's wrongful acts and omissions, Walter Stackhouse suffered severe physical and emotional injuries and wrongful death caused by NHL.  Mr. Stackhouse developed NHL and suffered fatal injuries as well as physical pain and mental anguish, diminished enjoyment of life and economic hardship during his lifetime.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT VI

### FRAUDULENT/NEGLIGENT MISREPRESENTATION

213.   Plaintiff incorporates by reference, as if fully set forth herein, each and every

allegation set forth in the preceding paragraphs and further alleges as follows.

214. Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Walter Stackhouse regarding the character and/or quality of, for guidance in his decision to select Roundup for use.

215. Defendant had a duty to disclose material information about serious health effects to consumers such as Walter Stackhouse. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Walter Stackhouse, to purchase Defendant's dangerous products.

216. Specifically, Defendant's advertisements regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing consumers, such as Walter Stackhouse, to purchase said product. Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

217. Defendant's representations regarding the character or quality of Roundup® were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

218. Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

219. Defendant negligently and/or intentionally misrepresented or omitted this

information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

220. In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Walter Stackhouse.

221. Walter Stackhouse reasonably relied to his detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Walter Stackhouse reasonably relied upon Defendant's representations to him that Roundup® was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

222. Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Walter Stackhouse. Instead of revealing the defects, Defendant continued to represent its product as safe for its intended use.

223. As a direct and proximate result of Walter Stackhouse's use of Roundup® as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Walter Stackhouse suffered personal injury, wrongful death and non-economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

<u>COUNT VII</u>

**UNFAIR AND DECEPTIVE TRADE PRACTICES**
**O.R.C. 4165.01 et seq.**

224.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

225.    By reason of its conduct as alleged herein, Defendant violated the provisions of the Ohio Deceptive Trade Practices Act, Chapter 4165 of the Ohio Revised Code by inducing Walter Stackhouse to use Roundup® through the use of false and/or misleading advertising, representations and statements.

226.    By engaging in the conduct described herein, Defendant violated the Act by, among other things:

> a.    Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.
>
> b.    Engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have, including but not limited to statements concerning the health consequences of the use of Roundup®.
>
> c.    Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive, including but not limited to facts relating to the health consequences of the use of Roundup®.
>
> d.    Engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup®.

227.    As a direct and proximate result of Defendant's violations of this Act, Walter Stackhouse suffered severe physical and emotional injuries and wrongful death. Mr.

Stackhouse developed NHL and  suffered fatal injuries as well as physical pain and mental anguish, diminished  enjoyment of life, and economic hardship for the remainder of his life.

WHEREFORE, Plaintiff respectfully requests that  this  Court enter  judgment in  h i s  favor  for  compensatory,  treble,  and  punitive  damages,  together  with  interest,  costs herein incurred,  attorneys' fees, and all such other  and  further  relief  as  this  Court deems  proper and  just.  Plaintiff also demands a jury trial on the issues contained h e r e i n .

## COUNT VIII

**WRONGFUL DEATH**
**O.R.C. 2125.01 et seq.**

228.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

229.    Plaintiff Mark Stackhouse, Executor of the Estate of Walter Stackhouse, claims damages under the Ohio Wrongful Death Statute.  In such capacity, Plaintiff brings this action, in part for the exclusive benefits of the following beneficiaries and next of kin: Mark Stackhouse, son of Walter Stackhouse and statutorily determined next of kin.

230.    This action is brought, pursuant to O.R.C. 21250.1, *et seq.*, for the loss of Walter Stackhouse's  services,  future  income,  protection,  case,  assistance,  society,  companionship, comfort, guidance, counsel and advice, and for the funeral and burial expenses Plaintiff was forced to incur.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mark Stackhouse, Executor of the Estate of Walter Stackhouse, demands judgment against Defendant Monsanto in excess of $75,000.00 on each of the above-referenced claims and causes of action as follows:

a.      Awarding special damages, including, but not limited to, medical, funeral, burial, and related expenses arising out of the wrongful death of Walter Stackhouse, including the loss of income;

b.      Awarding general damages, including Plaintiff's loss of the love, society, care, comfort, companionship, guidance, affection, services, association, and support of Walter Stackhouse;

c.      Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, pain and suffering and personal injuries suffered by Plaintiff Walter Stackhouse, healthcare costs, medical monitoring, together with interest and costs as provided by law;

d.      Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendant which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct;

e.      Awarding the costs and expenses of this litigation to Plaintiff;

f.      Awarding the Plaintiff the cost of these proceedings;

g.      Awarding reasonably attorneys' fees and costs to Plaintiff as provided by law;

h.      Awarding prejudgment and post-judgment interest to Plaintiff; and,

i.      Granting all such other relief as the Court deems necessary, just and proper.

Respectfully submitted,

s/ *Margaret M. Murray*
Margaret M. Murray (Ohio Bar No. 0066633)
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive

Sandusky, Ohio  44870
Telephone:     (419) 624-3000
Direct Dial:     (419) 624-3128
Facsimile:       (419) 624-0707
Email: mmm@murrayandmurray.com

Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts and as to all issues.

Dated: March 17, 2021                    Respectfully submitted,

                                         s/ *Margaret M. Murray*
                                         Margaret M. Murray (Ohio Bar No. 0066633)
                                         mmm@murrayandmurray.com
                                         MURRAY & MURRAY CO., L.P.A.

                                         Attorney for Plaintiff

## DESIGNATION OF TRIAL AND LEAD COUNSEL

Margaret M. Murray is hereby designated as the Plaintiff's trial and lead counsel.

Dated: March 17, 2021                    Respectfully submitted,

                                         s/ *Margaret M. Murray*
                                         Margaret M. Murray (Ohio Bar No. 0066633)
                                         mmm@murrayandmurray.com
                                         MURRAY & MURRAY CO., L.P.A.

                                         Attorney for Plaintiff